# Federal Reserve Board Efforts to Control Access to Buildings and Open Meetings

The Board of Governors of the Federal Reserve System may, consistent with its obligations under the Government in the Sunshine Act, place observers of an open meeting of the Board in a separate room to watch the meeting on closed-circuit television.

It is permissible under both the Sunshine Act and the Privacy Act for the Board to require disclosure of personal information and satisfaction of a security check as a condition of entering the Board's buildings for access to the separate room to observe an open meeting.

July 9, 2002

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

This memorandum responds to your request for our opinion regarding the permissibility, under the Government in the Sunshine Act ("Sunshine Act") and the Privacy Act, of certain actions that might be taken by the Board of Governors of the Federal Reserve System ("Board").[1] You have asked two questions: First, may the Board place all members of the public who wish to observe an open meeting of the Board in a room that is physically separate from the meeting room, where they can observe and listen to the meeting by closed-circuit television? Second, may the Board screen all members of the public seeking entrance to a Board building to observe an open meeting of the Board, by obtaining personal information and conducting a security check, and refuse admission to those who either refuse to give the information or fail the security check? We conclude that it would be permissible under both the Sunshine Act and the Privacy Act for the Board to engage in these actions.

## I.

"Because of its status as the world's most important central bank, the prominence of its Chairman, and the hugely adverse consequences to the United States and world economies that could result from an attack on the Federal Reserve, the Board . . . has significant security needs." Board Letter at 2-3. These needs have led the Board to consider adopting the measures outlined above.

As part of its duties, the Board conducts open meetings to discuss the country's economic health and to determine what actions, if any, must be taken to address inflation, unemployment, or other economic concerns. The Board is considering

---

[1] *See* Letter for Paul Colborn, Special Counsel, Office of Legal Counsel, from J. Virgil Mattingly, Jr., General Counsel, Board of Governors of the Federal Reserve System (Apr. 10, 2002) ("Board Letter").

adopting a policy of placing all members of the public who enter the Board's buildings to attend an open meeting of the Board in a room that is physically separate from the meeting room. In this room they can watch and listen to the meeting by closed-circuit television.

In addition, the Board is also considering screening all potential entrants to its buildings. The screening would require obtaining certain information from potential entrants and checking information with established law enforcement sources to evaluate possible security risks. The Board's security staff would solicit information such as name, date of birth, and social security number. The information would be solicited to the greatest extent possible under a pre-screening procedure, but also at the building's entrance. Consistent with current practice, potential entrants would be required to produce a photo ID at the door. Under the proposed plan, the Board would bar from the building any person who fails to provide the requested information or fails the security check.[2]

The first question we address is whether placing members of the public in a separate room to observe a Board meeting would be permissible under the Sunshine Act. We then turn to the permissibility of requiring members of the public to provide personal information and satisfy a security check before they may enter a Board building to observe a meeting. That question entails issues under both the Sunshine Act and the Privacy Act.

## II.

The Sunshine Act, 5 U.S.C. § 552b (2000), applies to agencies that are headed by a collegial body of two or more members. *Id*. § 552b(a)(1). The Act requires that covered agencies hold their deliberations on agency action in open meetings: "Members shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c) [providing for exceptions not relevant to the question presented here], every portion of every meeting of an agency shall be *open to public observation*." *Id*. § 552b(b) (emphasis added). The contemplated Board action of providing for observation of the meeting in a separate room would be inconsistent with this open-meeting requirement only if the italicized language requires the Board to allow members of the public to enter the actual meeting room and observe the meeting there. We do not believe that the statute imposes such a requirement.

Under a straightforward reading of the "open to public observation" language of subsection (b), the Board may satisfy its statutory requirement by providing a separate room for members of the public to observe Board meetings by closed-circuit television. The Sunshine Act does not authorize members of the public to

_____

[2] The Board notes that the White House and the Treasury Department have similar clearance procedures to control access to their buildings. Board Letter at 2.

participate in meetings, nor does it permit them to disrupt meetings. *See* Barbara Allen Babcock, *Department of Justice Letter to Covered Agencies* (Apr. 19, 1977) ("DOJ Letter"), *in* Richard K. Berg & Stephen H. Klitzman, *Interpretive Guide to the Government in the Sunshine Act* 121 (1978) ("*Interpretive Guide*"). Since the public is not authorized to participate in the meeting, there is nothing inherent in the concept of "open to public observation" that would obligate the Board to place members of the public in the same room as the Board. As long as the public can adequately see, hear, and understand what takes place in the meeting, the requirement will have been met because the meeting would be "open to public observation."

The legislative history of the Sunshine Act is consistent with our view that "open to public observation" does not contain an implied requirement that members of the public be present in the actual meeting room in order to observe a meeting. The Sunshine Act "is founded on the proposition that the government should conduct the public's business in public. [The Act] requires . . . all Federal agencies subject to the legislation to conduct their meetings in the open, rather than behind closed doors." S. Rep. No. 94-354, at 1 (1975). In other words, the critical purpose of the Act is to ensure that the decisionmaking meetings of covered agencies be open, not closed. Thus, so long as the Board's meetings are conducted "in the open" and the public can observe the meetings, this purpose would be satisfied.

The phrase "open to public observation" was adopted by the House of Representatives, and accepted by the conference committee, as a substitute for the "open to the public" formulation adopted by the Senate. The House committee gave the following rationale for the change: "The phrase 'open to public observation,' while not affording the public any additional right to participate in a meeting, is intended to guarantee that *ample space*, *sufficient visibility*, and *adequate acoustics* will be provided." H.R. Rep. No. 94-880, pt. 1, at 8 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2183, 2190 (emphasis added); *see also* H.R. Rep. No. 94-1441, at 11 (1976) (Conf. Rep.), *reprinted in* 1976 U.S.C.C.A.N. 2183, 2247 ("The phrase 'open to public observation' is intended to guarantee that ample space, sufficient visibility, and adequate acoustics will be provided."). Placing members of the public in a large enough separate room with adequate closed-circuit television capability would satisfy that purpose.

## III.

Whether the Board may deny individuals access to Board buildings to observe an open meeting turns on whether the Sunshine Act provides each individual member of the public with a right to observe an open meeting of a covered agency. Resolution of that question also determines the Privacy Act question that you have raised.

## A.

The open meeting requirement of subsection (b) of the Sunshine Act—that meetings be "open to public observation"—is not stated in terms of granting a right to individuals to attend agency meetings, but rather is articulated in more general language obligating an agency to provide the public as a whole with the opportunity to observe meetings. Thus, we believe that the requirement is satisfied if members of the general public have the opportunity to attend the meeting. The language does not constitute a requirement that *all* members of the public, or any particular individuals, who wish to observe a meeting be allowed to do so.[3]

The Sunshine Act's Declaration of Policy states that "[i]t is the purpose of this Act to provide the public with . . . information [about government decisionmaking] while protecting . . . the ability of the Government to carry out its responsibilities." 5 U.S.C. § 552b note. Pursuant to other statutory authority, the Board has sole control of its buildings. *See* 12 U.S.C. § 243 (2000) ("The Board may maintain, enlarge, or remodel any building or buildings so acquired or constructed and shall have sole control of such building or buildings and space therein."). Sole control of its buildings implies that the Board should be able to deny access to its buildings for reasonable reasons, such as the significant security concerns expressed by the Board, *see* Board Letter, *supra* note 1, at 1 (citing a desire to implement stronger security measures in controlling access to the buildings "in order to address increased concerns about attacks on its buildings"). Thus, reading the Board's statutory control over its buildings together with the Sunshine Act's open meeting requirement further reinforces our conclusion that although the public as a whole is entitled to observe Board meetings, particular individuals can be turned away.

The legislative history of the Sunshine Act comports with our reading. As discussed above, the Sunshine Act's legislative history indicates that Congress's purpose in enacting the open meeting requirement was to ensure that decisionmaking meetings be held in the open and not behind closed doors. That history does not reveal any congressional intent to create a right for every individual to attend the meetings. In addition, Congress used the phrase "open to public observation" to address logistical concerns: it wanted adequate space to accommodate meeting observers. The legislative history indicates that an agency is not required under the Act to guarantee that every person who seeks to attend a

---

[3] Even the Sixth Amendment, which establishes for defendants a constitutional right to a "public trial," does not give an individual member of the public the right to attend a trial. Rather, a trial open to the public in general satisfies the constitutional requirement. *See Estes v. Texas*, 381 U.S. 532, 588-89 (1965) (Harlan, J., concurring) ("Obviously, the public-trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission.").

meeting may do so, so long as accommodation for a reasonable number of people is provided. *See* S. Rep. No. 94-354, at 19 (emphasis added) ("When a meeting must be open, the agency should make arrangements for a room large enough to accommodate a reasonable number of persons interested in attending. Holding a meeting in a small room, thereby denying access to most of the public, would violate this section and be contrary to its clear intent.").[4]

## B.

As discussed above, we believe that the open meeting requirement of the Sunshine Act does not provide all individuals with the right to observe a covered agency's meetings, but rather only imposes on the agency the obligation to hold open meetings—that is, meetings open to the public at large. We therefore concluded that it would be permissible under the Sunshine Act for the Board to require that individuals seeking to observe Board meetings provide personal information and satisfy a security check. It necessarily follows from that conclusion that such a practice by the Board would not violate section 7 of the Privacy Act, which makes it unlawful for an agency "to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number." Pub. L. No. 93-579, § 7, 88 Stat. 1896, 1909 (1974). This is so because the Sunshine Act's open meeting requirement does not create an individual "right, benefit, or privilege" within the meaning of section 7 of the Privacy Act.

The legislative history regarding this provision of the Privacy Act supports the view that the provision's reference to "right, benefit, or privilege" refers to individual rights granted by the Constitution or statutes. The Senate debates provide an example of what the provision was intended to cover: "[I]t will be unlawful to commence operation of a State or local government procedure that

---

[4] We disagree with a portion of the 1977 DOJ Letter that bears on this question. The DOJ Letter states that "[o]f course, any person may attend a meeting without indicating his identity and/or the person, if any, whom he represents and no requirement of prior notification of intent to observe a meeting may be required." *Interpretive Guide* at 121. We find nothing in the text of the Sunshine Act that precludes imposing such requirements, nor do we see anything in the legislative history that suggests such an effect. We note further that the DOJ Letter was signed by the head of the Civil Division, which is a litigation division of the Department of Justice, and not by the Office of Legal Counsel, which is the component of the Department responsible for providing legal advice. The broad interpretation of statutory terms throughout the DOJ Letter apparently reflects a desire to improve the government's litigating position under the Sunshine Act. For example, the DOJ Letter recommends that agencies allow sound recordings, notes, and photography "in order to avoid needless litigation over issues which do not go to the heart of the Act." *Id. See also id.* ("I suggest that you insure that the term 'meeting' is broadly defined in practice so that the statute of limitations can come into play and so that the potential for litigation can be reduced."). Although we understand the practical interest in defining terms broadly to minimize litigation risk, we believe that the correct reading of "open to public observation" is that it is addressed only to the agencies as a requirement that the meeting be open to the public at large.

requires individuals to disclose their social security account number in order to register a motor vehicle, obtain a driver's license or other permit, or exercise the right to vote in an election." 120 Cong. Rec. 40,407 (1974) (statement of Sen. Ervin). Attending a meeting open to the public under the Sunshine Act is qualitatively different from receiving a driver's license or exercising the right to vote. Any individual who meets the necessary requirements may drive a car or vote in an election because the law gives each individual that right. Voting involves a core individual right. Driving a car is a daily activity engaged in by many individuals. Nothing in the Sunshine Act, however, provides any particular member of the public with a right to observe an agency meeting. All the Act does is require the agency to open its deliberative meetings to public observation. The denial of access to an individual who fails to provide a social security number or pass the security check may prevent that particular person from observing the meeting, but it does not foreclose the public observation of the meeting by other members of the public who provide their social security numbers and pass the security check.

## IV.

We conclude that the Board may, consistent with its obligations under the Sunshine Act, place observers of an open meeting of the Board in a separate room to watch the meeting on closed-circuit television. We also conclude that it is permissible under both the Sunshine Act and the Privacy Act for the Board to require disclosure of personal information and satisfaction of a security check as a condition of entering the Board's buildings for access to the separate room to observe the open meeting.

M. EDWARD WHELAN III
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*